# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JAMEY JACKSON,

                Petitioner,

v.

RANDALL HEPP,

                Respondent.

Case No. 19-CV-49-JPS

**ORDER**

      Petitioner Jamey Jackson ("Jackson") brings this petition for a writ of habeas corpus to challenge a state court conviction arising from Milwaukee County Circuit Case No. 2014CF002307. (Docket #1). In that case, a jury found Jackson guilty of being a felon in possession of a firearm in connection with a shoot-out that occurred near a playground, resulting in the death of a young girl. Jackson claims that his due process rights were violated during his jury trial. Specifically, he contends that (1) his counsel was ineffective for failing to object to or move to suppress evidence of an impermissibly suggestive line up, in violation of his right to effective assistance of counsel; and (2) that the evidence at trial was insufficient to support a guilty verdict, in violation of his due process right. The parties[1]

---

[1] As noted in Jackson's reply brief, Randall Hepp ("Hepp") has replaced Brian Foster ("Foster") as the warden of the institution where Jackson is confined. (Docket #27). Accordingly, the Court directs that Hepp be substituted for Foster as the respondent in this action. Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution.").

have fully briefed their respective positions.[2] For the reasons explained below, the Court finds that Jackson's petition must be denied.

**1.    STANDARD OF REVIEW**

State criminal convictions are generally considered final. Review may be had in federal court only on limited grounds. To obtain habeas relief from a state conviction, 28 U.S.C. § 2254(d)(1) (as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA")) requires the petitioner to show that the state court's decision on the merits of his constitutional claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Brown v. Payton*, 544 U.S. 133, 141 (2005). The burden of proof rests with the petitioner. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The relevant decision for this Court to review is that of the last state court to rule on the merits of the petitioner's claim. *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006).

A state-court decision runs contrary to clearly established Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [those] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." *Brown*, 544 U.S. at 141. Similarly, a state court unreasonably applies clearly established Supreme Court precedent when it applies that precedent to the facts in an objectively unreasonable manner. *Id.*; *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013).

---

[2]The Court will grant the respondent's motion for an extension of time to file a response brief. (Docket #25).

The AEDPA undoubtedly mandates a deferential standard of review. The Supreme Court has "emphasized with rather unexpected vigor" the strict limits imposed by Congress on the authority of federal habeas courts to overturn state criminal convictions. *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011). It is not enough for the petitioner to prove the state courts were wrong; he must also prove they acted unreasonably. *Harrington v. Richter*, 562 U.S. 86, 101 (2005); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014) ("An 'unreasonable application of' federal law means 'objectively unreasonable, not merely wrong; even 'clear error' will not suffice.'") (quoting *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)).

Indeed, the petitioner must demonstrate that the state court decision is "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013) (quoting *Harrington*, 562 U.S. at 102). The state court decisions must "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *Hartjes v. Endicott*, 456 F.3d 786, 792 (7th Cir. 2006). Further, when a state court applies general constitutional standards, it is afforded even more latitude under the AEDPA in reaching decisions based on those standards. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

As the Supreme Court has explained, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102. Indeed, Section 2254(d) stops just short of "imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings."

*See id.* This is so because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

A federal court may also grant habeas relief on the alternative ground that the state court's adjudication of a constitutional claim was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). The underlying state court findings of fact and credibility determinations are, however, presumed correct. *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013). The petitioner overcomes that presumption only if he proves by clear and convincing evidence that those findings are wrong. 28 U.S.C. § 2254(e)(1); *Campbell*, 770 F.3d at 546. "A decision 'involves an unreasonable determination of the facts if it rests upon factfinding that ignores the clear and convincing weight of the evidence.'" *Bailey*, 735 F.3d at 949–50 (quoting *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). If shown, an unreasonable factual determination by the state court means that this Court must review the claim in question *de novo*. *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008).

## 2. RELEVANT BACKGROUND

On May 21, 2014, a group of friends sat on some low steps immediately in front of a gated playground. *See* (Docket #15-7 at 128:2–7). As a man by the name of Sylvester Lewis ("Lewis") biked past the group, one member of the group hurled an insult at him. Another member of the

group—a man later identified as Jackson—stood up and fired a gun at Lewis, which narrowly missed his ear. Lewis returned the shot eight-fold, spraying bullets towards his shooter and the playground. The shooter avoided injury, but one of the bullets struck and killed a young girl playing nearby.

An investigation occurred, which resulted in the arrest of Lewis. *See* (Docket #15-2 at 24). Lewis subsequently identified Jackson as the other person involved in the shooting. *Id.* Jackson was arrested on May 28, 2014. On May 30, 2014, police assembled three witnesses who were on or near the playground at the time of the shooting to help identify the shooter. These witnesses included BB, KG, and TM, whose ages ranged between twelve and sixteen. The police assembled a lineup of six people, with Jackson, the target, at number five in the lineup. BB, KG, and TM were brought into a room together to view a lineup. Each witness was given a piece of paper with the lineup report and a pencil to record impressions.

The officers brought in the lineup, allowed the witnesses to view the men, and then escorted the men out. The officers did not immediately collect the witnesses' lineup reports, or interview them after the first line up. After the lineup left, BB, the eldest, asked one of the officers if she could see number five—i.e., Jackson—again. The officers walked the lineup back in, in their original order. Following the second lineup, the officers collected the witnesses' papers and conducted individual interviews.

On her lineup report, BB had circled Jackson, indicated an asterisk, and wrote "that's him, 'Yella.'" After the second lineup, BB told Detective Carlos Rutherford that she was "one hundred percent positive" that Jackson was involved in the shooting because she saw him put a gun in his

waistband and flee the playground. She also claimed that she knew Jackson from around her neighborhood, and recognized him immediately.

KG, who was the sister of the deceased girl, had initially circled "no" under all six options in the lineup report. However, the report indicates that she crossed out the "no" for number five, and then circled "yes." Detective Kevin Klemstein interviewed KG after the second lineup and asked about the change. KG stated, that she "initially circled 'no' under number five but then realized she wanted to circle 'yes.'" *State v. Jackson*, 915 N.W.2d 456 (Table), 2018 WL 1175136, at *2 (Wis. Ct. App. Mar. 6, 2018). There is no explanation for what prompted the realization. In her initial interview with the police, on the day of the crime, she could not describe any of the men on the stairs, except to say what they were wearing. (Docket #15-2 at 29–30). However, after she viewed the lineup, she claimed to have seen Jackson on the day of the shooting with a gun, and identified him as "TY," who she knew from the neighborhood.

Finally, TM, who was KG's cousin, had circled "yes" next to number five on the lineup report, and noted that number five "looks familiar," which was also crossed out. There is no explanation for why the "looks familiar" note was crossed out. TM was interviewed by Detective Patrick Pajot. She told him that she saw the person at number five near the playground on the day of the shooting, and had seen him with a gun in his pants. She professed certainty that this person was the person who shot at Lewis, and claimed that she recognized him from the neighborhood.[3]

---

[3]Oddly, although Detective Pajot's police report indicates that Jackson was the target of the lineup, his list of lineup participants does not include Jackson. *Compare* (Docket #15-2 at 27) (Detective Rutherford's report, which lists Jackson as number five in the lineup) *with id.* at 34 (Detective Pajot's report, which does not include Jackson in the lineup).

At trial, all three witnesses testified. BB testified that she had been walking to school when the shooting occurred. She heard gun shots, and then saw two men run past her, each with a gun in his pants. BB recognized Jackson as one of the runners, and indicated that her note "Yella" was in reference to his skin tone. She testified that when she asked the officer to bring number five back in for review, that she "did not ask out loud, but rather just asked the officer next to her so that he could hear her." *Jackson*, 2018 WL 1175136, at *2.

Detective Pajot later testified that he was the detective running the lineup, and he sat in the same room as the witnesses, but he could not see the witnesses because he was situated behind a "large console." (Docket #15-8 at 30:4–19). He testified that room was approximately 45 by 20 feet large, and the console was located in the corner of the room. *Id.* at 31:8–15. After the first lineup ran, he heard someone—but he could not see who— ask to see number five again. *Id.*

KG testified that at the time of the shooting, she was playing on the playground with her sister and their friends. KG's sister was hit by a stray bullet shot by Lewis. When KG heard the bullets, she ran to the side of the school. A man ran by her, and told her that someone was shot. KG then looked back towards the playground, where she saw her sister. Right in front of the playground, she saw the two shooters facing one another—one on the stairs, one in the street. KG testified that the shooter in the street was "Red," a young man from her neighborhood—this was Lewis. She testified that the man shooting Red was number five in the lineup, i.e., Jackson. However, KG also testified that she did not know Jackson by name or nickname, and was not sure why she wrote TY on the identification sheet. She also testified that the only person she saw "face-to-face" was the person

who ran past her, without a gun, who told her that someone was shot. (Docket #15-7 at 152:9–153:17).

Finally, TM testified that she was also on the playground at the time of the shooting. She states that she saw Jackson smoking a cigarette near a bench, and that she recognized him from the neighborhood. TM saw Jackson stand, and noticed a gun in his pants. Then she saw Jackson and Red/Lewis shoot at each other—Jackson shooting towards Red/Lewis and the street; Red/Lewis shooting towards Jackson and the playground. TM confirmed that she circled number five, i.e., Jackson, because she knew that he was the person involved in the shooting. However, when TM was asked to identify Jackson in the courtroom, she identified another man, in the gallery. A short recess ensued. During this recess, TM told a police officer that a stranger had approached her before she testified and told her not to identify Jackson because Jackson did not do it. TM recanted her testimony. She was *still* unable to identify Jackson right away, but after some questioning, she ultimately did so in court. *See id.* at 188:3–192:9. Later in her testimony, she got confused as to whether Jamey and "TY" were the same person or two different people. *Id.* at 214:18–216:25.

The jury found Jackson guilty. At post-conviction, Jackson filed a motion claiming ineffective assistance of counsel on the grounds that his trial attorney had failed to object to or attempt to suppress the lineup. He contended that the lineup was impermissibly suggestive because BB had asked to see number five again, which, he believed, KG and TM heard, and which he believed influenced their decisions. The post-conviction court did not hold a hearing on the issue, but, based on the briefing, determined that Jackson had "failed to show that BB's request influenced TM or KG in any way," and that all three witnesses were reliable in their identifications.

Page 8 of 18
Case 2:19-cv-00049-JPS   Filed 11/10/20   Page 8 of 18   Document 28

*Jackson*, 2018 WL 1175136, at *3. Moreover, the trial court found no prejudice because KG and TM each identified Jackson in court. Jackson appealed the post-conviction decision to the Court of Appeals, which affirmed the decision of the trial court. The Wisconsin Supreme Court denied review, making the issue ripe for this Court's consideration.

3. ANALYSIS

   3.1 Ineffective Assistance of Counsel

The Seventh Circuit's *Blake* opinion neatly summarizes the standards applicable to a claim of ineffective assistance:

> A party asserting ineffective assistance of counsel bears the burden of establishing two elements: (1) that his trial counsel's performance fell below objective standards for reasonably effective representation, and (2) that counsel's deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 . . . (1984)[.]
>
> To satisfy the first element of the *Strickland* test, appellant must direct the Court to specific acts or omissions by his counsel. In that context, the Court considers whether in light of all the circumstances counsel's performance was outside the wide range of professionally competent assistance. The Court's assessment of counsel's performance is "highly deferential[,] . . . indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" [*Id.* at 689.]
>
> . . .
>
> To satisfy the second *Strickland* element, appellant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, such that the proceedings were fundamentally unfair or unreliable. A reasonable probability is defined as one that is sufficient to undermine confidence in an outcome.

*Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013) (citations and quotations omitted).

The *Strickland* test, layered underneath the standard of review set forth in Section 1, produces the following question for the Court to answer: whether the Wisconsin Court of Appeals' ruling on Jackson's claims represents an unreasonable application of the already extremely deferential *Strickland* standard. *Harrington*, 562 U.S. at 101. As *Blake* explains, claims of ineffective assistance are already assessed with deference to the defendant's counsel. Presenting such claims in the context of a habeas proceeding means that Jackson must not only prove that the Wisconsin Court of Appeals' analysis was wrong, but additionally that it was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 103; *id.* at 105 ("The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so[.]") (citations and quotations omitted). To the extent that Jackson seeks to show that the Wisconsin Court of Appeals' decision was based on an "unreasonable determination of the fact" under 28 U.S.C. 2254(d)(2), he must do more than merely show that the evidence is debatable. *Wood*, 558 U.S. at 303. He most show that "the state court determined an underlying factual issue against the clear and convincing weight of the evidence." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008). Additionally, in the context of a *Strickland* analysis, he must show that this unreasonable evidentiary finding resulted in prejudice. *Id.* at 550.

An eyewitness can be "prevented from identifying a suspect in court only if the pretrial procedure 'was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *United States v. Williams*, 522 F.3d 809, 810 (7th Cir. 2008) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *State v. Benton*, 625 N.W.2d 923

(Wis. 2001) ("A criminal defendant is denied due process when identification evidence admitted at trial stems from a pretrial police procedure that is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.") (citations and quotations omitted).

If the lineup is deemed impermissibly suggestive, then courts consider "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199 (1972). Factors to consider are the opportunity to see the defendant during the crime; "the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id*. at 199–200; *Wright v. State*, 175 N.W.2d 646, 652 (Wis. 1970).

In concluding that the lineup was not impermissibly suggestive, the Wisconsin Court of Appeals, after reviewing the evidence *de novo*, concluded that "[n]othing suggests that KG or TM even heard BB's request, let alone were influenced by it." *Jackson*, 2018 WL 1175136, at *4. A quick look through the record demonstrates that this is patently incorrect. First, Detective Pajot testified that the lineup was conducted in a very large room that only had five witnesses in it, and he, sitting in a corner behind a console, could hear the request to see number 5 again. If Pajot heard the request, this raises the inescapable inference that the two younger witnesses heard BB's request, as well. Second, on her report, KG initially circled "no" for number five, but then crossed it out and circled "yes." The Court of Appeals rubber stamped the detectives' post-lineup interviews as satisfactory, but the detectives did not ask why KG changed her answer,

nor question why, if she knew Jackson from the neighborhood, she failed to identify him to the police earlier. The same is true for TM, who wrote "Ty," in the margins of her lineup report, but did not tell the police that the shooter was named "Ty."

In short, there is absolutely no evidence that KG or TM had independently identified number five as the shooter prior to BB's interjection. To the contrary, there is some evidence that they were affected by her interjection. *See Williams*, 522 F.3d at 812 (upholding the constitutionality of an identification and noting that the three witnesses "viewed the lineup separately and there was no risk that one person's identification would influence the others."). However, the lineup was not suggestive as to BB, who independently identified Jackson as a man who had the gun, and who made the request to see him again.

Because it concluded that the lineup was not impermissibly suggestive, the Wisconsin Court of Appeals did not analyze the totality of the circumstances in determining whether TM and KG's identifications were, nevertheless, reliable. The Court thus reviews the record *de novo*, and finds that under the totality of circumstances, these identifications were not reliable. *See Carlson*, 526 F.3d at 1024. While KG and TM both claimed to have known Jackson from the neighborhood, aside from his skin tone, neither witness provided the police with a detailed physical description of what he looked like on the day of the crime—the description was primarily based on what he wore. Neither KG nor TM were facing Jackson or paying attention to Jackson during the crime (they were both involved with their friend groups), and it is clear that at least KG was uncertain, at the time of the lineup, as to whether Jackson was the shooter. Neither witness claims to have gotten a good look at him during the commission of the crime.

The evidence clearly demonstrates a suggestive lineup as to KG and TM, and the totality of the circumstances leaves open the possibility that KG and TM's identifications were unreliable. The Court therefore concludes that trial counsel's failure to move to suppress KG and TM's identification testimony fell below objective standards of reasonableness, and the Wisconsin Court of Appeals' holding was contrary to the weight of evidence. *Strickland*, 466 U.S. at 688. However, the Court cannot find that there was "a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 694.

While KG and TM's identifications may well have warranted suppression, their testimony at trial did not actually help the prosecution. At one point, TM identified the wrong man in court—it is difficult to envision a better turn of events for a defendant in Jackson's position. Then, even after identifying Jackson and explaining the cause of her misidentification, she had difficulty confirming that "Ty" and Jackson were the same person. At another point, KG admitted that the only person she got a clear look at was a man running away from the scene—not Jackson— who told her that a girl had been shot. KG and TM each delivered confused, contradictory, and uncertain accounts of the crime. They were each thoroughly cross-examined. The jury had ample opportunity to consider the reliability of the identification and the chance of error. The jury heard this scrambled testimony, saw the erroneous in-court identification, understood the logistics of the witness's positions on the playground, and still found Jackson guilty—apparently based on other evidence in the record.

That other evidence would have included testimony from BB, who independently identified Jackson at the lineup, and who gave a cogent and

unwavering testimony at trial. If KG and TM's testimony were excluded, there is still a high likelihood that BB's testimony would have been more than sufficient to find Jackson guilty of possessing of a firearm—specifically because she testified confidently and consistently that she saw him running away from the scene of the crime—towards her—in broad daylight with a gun tucked in his pants. Accordingly, the Court does not find a reasonable probability that the outcome of the trial would have been different had the suppression motion been filed.

### 3.2 Sufficiency of Evidence

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). To successfully challenge the sufficiency of the evidence of a conviction, a habeas petitioner must show that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt" based on the evidence presented at trial. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The court need not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* at 318–19 (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966))."Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original).

In *State v. Poellinger*, the Wisconsin Supreme Court adopted a similarly deferential standard for reviewing challenges to the sufficiency of evidence, which stems from *Jackson v. Virginia*. 451 N.W.2d 752, 757 (Wis. 1990). *Poellinger*, 451 N.W.2d 752, 757 (1990). Specifically, in *Poellinger*, the Wisconsin Supreme Court stated that "when faced with a record of

historical facts which supports more than one inference, an appellate court must accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law." *Id.* (citing *Jackson*, 443 U.S. at 326).

Pursuant to *In re Winship*, the State needed to provide evidence to prove, "beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. Milwaukee's felon-in-possession law provides, "A person who possesses a firearm is guilty of a Class G felony if any of the following applies: (a) The person has been convicted of a felony in this state." Wis. Stat. § 941.29(1m)(a). Jackson did not contest that he had previously been convicted of a felony; thus, all that was left to prove was that he possessed a firearm.

The Wisconsin Court of Appeals addressed Jackson's sufficiency of the evidence challenge by discussing, in large measure, the testimony of TM and KG. Because the Court has found the Court of Appeals' ruling on that testimony as contrary to the weight of evidence, the Court will focus on the Court of Appeals' analysis of BB's testimony, wherein she

> told the jury that Jackson ran past her after the shooting while holding a gun. She also explained her lineup report, telling the jury that she was "100 percent" certain Jackson was one of the men on the scene with a gun.

*Jackson*, 2018 WL 1175136, at *5. Pursuant to the principles set forth in *Jackson v. Virginia*, and subsequently adopted in *Poellinger*, the Wisconsin Court of Appeals was properly deferential to the trier of fact. All that was required to convict under Wis. Stat. § 941.29 was testimony that Jackson had been seen with a gun—which BB's testimony unequivocally provides. The jury's conclusion would have taken into account the shakiness of TM and

KG's testimony, and discounted it appropriately. The Wisconsin Court of Appeals' decision does not run contrary to, or erroneously apply, Supreme Court precedent. To the contrary, the Court of Appeals properly gave "full play to the responsibility of the trier of fact. . .to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

### 5. CONCLUSION

For the reasons explained above, the Court finds Jackson's asserted grounds for relief to be without merit. Although the Wisconsin Court of Appeals erred in concluding that counsel was reasonable for failing to file a motion to suppress the lineup, the Court's *de novo* review of the record indicates that this error was not prejudicial to Jackson. *Carlson*, 526 F.3d at 1024. Additionally, the record reflects that Jackson's constitutional rights were not violated as to the sufficiency of the evidence.

Under Rule 11(a) of the Rules Governing Section 2254 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), a petitioner must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citations omitted). As the Court discussed above, no reasonable jurists could debate whether the petition has merit. The Court must, therefore, deny Jackson a certificate of appealability.

Finally, the Court closes with some information about the actions that Jackson may take if he wishes to challenge the Court's resolution of this

case. This order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Accordingly,

**IT IS ORDERED** that Respondent's motion for an extension of time to file a response brief (Docket #25) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Petitioner Jamey Jackson's petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 (Docket #1) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability as to Petitioner Jamey Jackson's petition be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 10th day of November, 2020.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge